**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GARY MANGINI,

            Plaintiff,

     v.

PENSKE LOGISTICS,

            Defendants.

Civil No. 11-0270 (NLH/KMW)

**OPINION**

**APPEARANCES:**

Joshua S. Boyette, Esquire
Justin L. Swidler, Esquire
Richard Steven Swartz, Esquire
Swartz Swidler LLC
1878 Marlton Pike East
Suite 10
Cherry Hill, New Jersey 08003
    *Attorneys for Plaintiff Gary Mangini*

Michael D. Homans, Esquire
Rachel E. Licausi, Esquire
Flaster Greenberg PC
1810 Chapel Avenue West
Cherry Hill, New Jersey 08002
    *Attorneys for Defendant Penske Logistics LLC*

**HILLMAN, District Judge**

    This matter comes before the Court by way of Defendant Penske Logistics LLC's motion [Doc. No. 7] seeking summary judgment in this action pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides this matter pursuant to Federal Rule of Civil Procedure 78.

For the reasons expressed below, Defendant's motion for summary judgment will be denied.

I.    **JURISDICTION**

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and an amount in controversy in excess of $75,000.  As set forth in the Joint Attorney Certification filed on August 8, 2012, Plaintiff Gary Mangini is a citizen of State of New Jersey.  (Joint Att'y Certification [Doc. No. 16] ¶ 1.)  Defendant Penske Logistics LLC[1] (hereinafter, "Penske" or "Defendant") is a limited liability company.  (Id. ¶ 2.)  Based on the citizenship of its various members as detailed in the Joint Attorney Certification, Penske is a citizen of the states of Delaware, Maryland, Michigan, Pennsylvania, and Tennessee.  (Id. ¶¶ 2-5.)  Therefore, complete diversity of citizenship exists between the parties to this action.  The parties agree that the amount in controversy in this matter exceeds the sum of $75,000 exclusive of interests and costs.  (Id. ¶ 7); (see also Answer to Demand for Statement of Damages [Doc. No. 1-3], Ex. B to Def.'s Notice of Removal 1.)

---

1.  Defendant was improperly identified in the complaint as Penske Logistics rather than Penske Logistics LLC.

II.   <u>**BACKGROUND**</u>

Plaintiff originally filed the complaint in this action in the Superior Court of New Jersey, Law Division for Camden County asserting a cause of action under the New Jersey Conscientious Employee Protection Act ("CEPA") based on an alleged incident that occurred with his employer, Penske, on September 25, 2010. (Pl.'s Compl. [Doc. No. 1-2] ¶ 1, Ex. A to Def.'s Notice of Removal.)  Defendant subsequently removed Plaintiff's action to this Court pursuant to 28 U.S.C. §§ 1441, 1446, asserting jurisdiction on the basis of diversity of citizenship as set forth in 28 U.S.C. § 1332.

Penske is a trucking and logistics firm which operates a facility in Bridgeport, New Jersey through which Penske handles the loading and delivery of baked goods and refrigerated food items to retail store customers in New Jersey, Pennsylvania, Delaware, Maryland, and Virginia.[2]  In January of 2008, Plaintiff began working for Penske at the Bridgeport location as a commercial truck driver, also referred to as a delivery route driver, and was employed in that capacity until late September of 2010.  Plaintiff's complaint in this action arises out of an

---

2.  Unless otherwise indicated, information regarding the facts underlying Plaintiff's case as set forth in this Opinion are taken from the parties' statements of undisputed material fact submitted pursuant to Local Civil Rule 56.1(a) and the respective responses thereto.  (<u>See generally</u> Doc. Nos. 7-1, 10-2, 10-3, 12-1.)

incident that occurred on September 25, 2010, which ultimately resulted in the termination of Plaintiff's employment by Penske for his alleged "Refusal to Dispatch" on a delivery route assigned to him.

While the parties dispute the specific reason underlying Plaintiff's termination for refusal to dispatch, the majority of the facts surrounding the September 25, 2010 incident are not in dispute.  On that day, Plaintiff arrived at work at approximately 4:00 p.m. and completed a routine pre-trip inspection report for his delivery truck which revealed no safety issues with respect to the truck or the equipment.[3]  At Penske's Bridgeport facility, delivery route drivers, like Plaintiff, are responsible for loading and securing all product assigned for delivery on a particular route.  Penske delivery trucks at this facility are typically loaded by first placing product against the side metal walls of the trucks in order to leave the center aisle open for the purposes of loading and unloading product at various locations along the delivery route.

On September 25, 2010, following his pre-trip inspection, Plaintiff proceeded to the loading dock and was directed to load certain product onto his truck for delivery, including metal

---

3.  The parties agree that Plaintiff is not alleging in this case that there was any defect with respect to the equipment or the truck that in any way made Plaintiff's assigned delivery that day unsafe.

carts (referred to as "cans") filled with donuts, bagel trays, bread trays, totes and pretzels.  During the course of loading his truck, it became apparent to Plaintiff that he could not fit all of the product designated for delivery on that route that day in the side aisles of his truck.  As a result, Plaintiff requested that the loading dock supervisor, Valerie Poisson, ask the dispatcher, Janet Stockdill, to come to the loading dock and look at the truck to see which and how much product remained to be loaded.  Upon viewing the truck as initially loaded by Plaintiff, both Poisson and Stockdill suggested alternative loading arrangements for the truck which would permit Plaintiff to load more product into the side aisles.  Plaintiff heeded these suggestions, and while he was able to load more product onto the side aisles then he initially had, it appears that four sides of bagels and three-quarters of a stack of pretzels remained floating in the middle of the aisle.

The parties agree that, at this point, Plaintiff, believing the product load was "unsafe" for him to take out on his delivery route that day, informed Stockdill that he "wasn't going to work in an unsafe [manner] to where [he] could possibl[y] hurt" himself.[4]  (Def.'s Statement of Undisputed Material Facts in

_____

4. Although the parties dispute the precise reasons why Plaintiff believed the load was "unsafe" and the legal implications of any such alleged belief, they do not dispute that Plaintiff made this assertion and indicated his unwillingness to work in a "unsafe" manner.

Supp. of its Mot. for Summ. J. [Doc. No. 7-1] (hereinafter,
"Def.'s Stat. of Facts"), ¶ 31) (citing Pl.'s Sept. 27, 2010
Email Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi
[Doc. No. 7-7] 2-3.)  After Plaintiff indicated his unwillingness
to work in an unsafe manner, Stockdill informed Plaintiff that he
would be suspended until further notice for refusing to take the
assigned route.  (Dep. Tr. of Janet Stockdill, Ex. 13 to Decl. of
Rachel E. Licausi [Doc. No. 7-7] 8:2-7.)

     Shortly thereafter, Stockdill called Paul Donnelly,
Operations Manager at Penske and Plaintiff's supervisor, and
informed him of the situation.  (Pl.'s Sept. 27, 2010 Email
Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi [Doc.
No. 7-7] 2-3.)  Donnelly similarly informed Plaintiff that he
would be suspended until further notice for the refusal to take
work.  At that point, the parties agree that Plaintiff "again
told ... Donnelly that he did not wish to complete the job if it
was unsafe."  (Pl.'s Counterstatement of Material Facts [Doc. No.
10-2] ¶ 20); (see also Def.'s Reply to Pl.'s Counterstatement of
Material Facts [Doc. No. 12-1] ¶ 20) (admitting same).

     Prior to suspending Plaintiff for the refusal to dispatch,
Donnelly asked Plaintiff if he recognized what he was doing by
refusing to take the load to which Plaintiff replied that it was
unsafe.  Specifically, Donnelly stated "[G]ary I want you to
understand what[']s going to happen here[.] [Y]ou['re] going to

be suspended until HR gets back to you and that [I] [am] going to push for termination[.]"  (Pl.'s Sept. 27, 2010 Email Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi [Doc. No. 7-7] 3); (see also Def.'s Stat. of Facts ¶ 34.)  In response to Donnelly's question, Plaintiff replied "[W]hy [P]aul[,] because I don't want to put myself in a situation ... where [I] could possibly get hurt?"  (Pl.'s Sept. 27, 2010 Email Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi [Doc. No. 7-7] 3.) After this brief exchange, Plaintiff claims, but Defendant disputes, that he told Donnelly that he would in fact "go do the route[.]" (Id.; see also Dep. of Gary Mangini, Ex. 2 to Decl. of Rachel E. Licausi [Doc. No. 7-4] 149:6-17, 20-24) (... I brought up a valid point of [an] unsafe act, and I wasn't willing to lose my job over something that I was not comfortable doing to where I could potentially hurt myself. ... So, ... I offered to do the route because I didn't want to get terminated over something I shouldn't have got[ten] terminated over.  I was expressing concern.").  Plaintiff contends that after he offered to take the route in spite of his safety concerns, Donnelly told him not to worry about it because once Plaintiff had refused the route, he wasn't allowed to get in the delivery truck.  (Pl.'s Sept. 27, 2010 Email Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi [Doc. No. 7-7] 3.)  Plaintiff asserts that he was instructed to go home and wait to be contacted by human resources

7

at Penske.  (Id.)

The parties agree that at approximately 4:40 p.m. on September 25, 2010, Donnelly suspended Plaintiff for refusal to dispatch with intent to terminate.  Subsequently, Donnelly contacted Barbara Miletics, a Human Resources manager, and informed Miletics that Plaintiff had refused to deliver a load for safety reasons.  Donnelly reviewed his recommendation to terminate Plaintiff with Miletics and requested approval to terminate Plaintiff's employment.  Miletics then requested that Plaintiff send her a statement regarding the events of September 25, 2010, requested statements from Donnelly, Stockdill, and Poisson, and conducted a review of incident.  After conducting a review of the incident and the relevant statements, Miletics confirmed and approved the decision to terminate Plaintiff's employment effective September 28, 2010.  Plaintiff's termination was based on a violation of Penske's Basic Standards of Conduct for Refusal to Dispatch, as set forth in the Penske Logistics Handbook for Non-Union Associates, which Plaintiff admits he received on at least two occasions.  At Penske, a Refusal to Dispatch is considered an act of insubordination and a refusal to do one's job, which can result in disciplinary action up to and including suspension or immediate involuntary termination.

## III. <u>DISCUSSION</u>

### A.   Standard for Summary Judgement

Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking judgment in its favor on Plaintiff's CEPA claim.  Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party

10

opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**B.   New Jersey Conscientious Employee Protection Act**

The New Jersey Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct."  <u>Dzwonar v. McDevitt</u>, 828 A.2d 893, 900 (N.J. 2003) (internal citation and quotation omitted). CEPA provides,

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
> > a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law ...; or ...
> > c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
> > > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
> > > (2) is fraudulent or criminal; or
> > > (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19-3.

11

In order to prevail on a claim under CEPA, a plaintiff must demonstrate that: (1) he reasonably believed that his employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he performed a whistle-blowing activity described in N.J. S<small>TAT</small>. A<small>NN</small>. § 34:19-3(c); (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 404 (3d Cir. 2007) (citing <u>Dzwonar</u>, 828 A.2d at 900).

A plaintiff proceeding under Section 34:19-3(c) "need not show that his or her employer or another employee *actually* violated the law or a clear mandate of public policy. ... Instead, the plaintiff simply must show that he or she '"*reasonably believes*" that to be the case.'" <u>Dzwonar</u>, 828 A.2d at 900 (citations omitted) (emphasis added). As the Third Circuit has recognized, "[t]he plaintiff need not 'set forth facts that, if true, would constitute a violation of [a statute],' ... but he must establish a 'substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff[.]'" <u>Bocobo v. Radiology Consultants of South Jersey, P.A.</u>, No. 07-3142, 2012 WL 1302576, *6 (3d Cir. Apr. 17, 2012) (citing <u>Dzwonar</u>, 828 A.2d at 901; <u>Caver v. City of Trenton</u>, 420 F.3d 243, 254 (3d Cir. 2005)).

Once the plaintiff establishes a prima facie case under
CEPA, "'the burden of production shifts to the defendant to
"articulate some legitimate, nondiscriminatory reason" for its
actions.' ... Once the defendant articulates a legitimate reason
for the adverse employment action, the presumption of retaliatory
discharge created by the prima facie case disappears and the
burden shifts back to the plaintiff." Blackburn v. United Parcel
Service, Inc., 179 F.3d 81, 92 (3d Cir. 199) (citations omitted).
On a motion for summary judgment, "the court must determine
whether the plaintiff has offered sufficient evidence for a
reasonable jury to find that the employer's proffered reason for
the discharge was pretextual and that retaliation for the
whistleblowing was the real reason for the discharge." Id. at
92-93.

IV.  **ANALYSIS**

In moving for summary judgment, Defendant argues that
Plaintiff cannot establish a prima facie case under CEPA because
(1) Plaintiff did not have an objectively reasonable belief that
Penske's conduct violated a law, rule, regulation or a clear
mandate of public policy; (2) Plaintiff did not perform a
whistle-blowing activity pursuant to Section 34:19-3c of the Act;
and (3) Plaintiff cannot demonstrate a causal connection between
any alleged whistle-blowing activity and his dismissal. (Def.'s

13

Mem. of Law in Supp. of its Mot. for Summ. J. [Doc. 7-2]

(hereinafter, "Def.'s Mem."), 7-24.)[5]

The majority of Defendant's motion argues that Plaintiff is unable to establish the first element of a prima facie case under CEPA — that the plaintiff reasonably believed that his employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy.  The New Jersey Supreme Court has previously explained that this element "does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true.  Instead, a plaintiff must set forth facts that would support an *objectively reasonable belief* that a violation has occurred."  <u>Dzwonar</u>, 828 A.2d at 901.  On a motion for summary judgment, where the defendant asks the court to determine as a matter of law that a plaintiff's belief was not objectively reasonable, the role of this Court is limited.  As both the Third Circuit and the New Jersey Supreme Court have explained, the Court "must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff."  <u>Caver</u>, 420 F.3d at 254 (citing

---

[5]       Defendant concedes, however, that Plaintiff's "termination for Refusal to Dispatch constitutes an 'adverse employment action'" as required under the third element of a prima facie CEPA case.  Accordingly, the Court need not address the third element of the CEPA analysis in this Opinion.

Dzwonar, 828 A.2d at 901).  Where the Court finds that a
substantial nexus exists at the summary judgment stage, then it
must be left to the jury to "determine whether the plaintiff
actually held such a belief and, if so, whether that belief was
objectively reasonable."  A district court "overstep[s] its
bounds by deciding for itself whether [a plaintiff's] complaints
were 'trivial' or 'reasonable.'  This is an issue of fact that
has been specifically reserved for the jury under New Jersey case
law."  Caver, 420 F.3d at 255.

In arguing that Plaintiff cannot establish the first element
of his CEPA claim, Defendant asserts that Plaintiff's testimony
demonstrates that "the sole reason he refused to take the load
was concern about possible personal injury to himself" with
regard to moving extra product around and possibly straining his
back, and that such "a personal concern about one's own potential
injury — and not a legal violation or threat to the public
interest — is not protected by CEPA."  (Def.'s Mem. 12.)
Defendant argues that Plaintiff's refusal to take the load was
based on a personal preference and his own individual standards
as to risk of injury which is insufficient to allege a violation
of the law.  (Id. at 13.)  Defendant characterizes Plaintiff's
objection to taking his assigned load on September 25, 2010 as a
"disagreement with Penske's lawful business decision not to cater
to his personal preferences and concerns" and that this sort of

private dispute is not actionable under CEPA.  (<u>Id.</u> at 14.)

Defendants further argue that Plaintiff's vague reference in his September 27, 2010 email to Penske Human Resources manager Barbara Miletics to "new federal regulations" which granted Plaintiff the right to "refuse any work" which he deemed was unsafe is not an adequate basis to support his CEPA claim because Plaintiff must identify the law or policy allegedly violated. (<u>Id.</u> at 15.)  According to Defendant, Plaintiff's "inability to identify a 'new regulation' that gives drivers the right to refuse work they personally deem unsafe dooms his CEPA claim, as a matter of law."  (<u>Id.</u>)  Defendant also argues that Plaintiff's belated attempt to cite federal regulations regarding the strapping and securing of cargo as referenced in his complaint also cannot save his CEPA claim because Plaintiff never previously expressed any concerns about the strapping or securing of the product with respect to the September 25, 2010 incident, including in his follow up email statement to Human Resources. (<u>Id.</u> at 15-16.)  Thus, Defendant argues that Plaintiff's concerns "lacked 'any substantial nexus' to the regulations he cited post-termination relating to the securing and strapping of product, and Plaintiff cannot now attempt to retroactively change the nature of his pre-termination concerns and beliefs."  (<u>Id.</u> at 16.)  Finally, Defendant asserts that allowing Plaintiff's claims to proceed would have extreme public policy consequences because

Plaintiff is asking the Court to "expand CEPA to hold ... that
... any New Jersey employee can avoid work by asserting it would
violate his or her own personal standards of safety, regardless
of whether there is any alleged legal violation." (Id. at 18.)

In considering Defendant's arguments, the Court, in deciding
the present motion for summary judgment, cannot make credibility
determinations or engage in any weighing of the evidence.
Marino, 358 F.3d at 247.  Rather, the Court is required to
believe the evidence of the nonmoving party and draw all
reasonable inferences in Plaintiff's favor.  Id.  Here, Plaintiff
has come forward with sufficient evidence which, drawing all
reasonable inferences in his favor, demonstrates that a
substantial nexus exists between the complained-of conduct and a
violation of a law, rule, regulation or clear mandate of public
policy.  While Defendant consistently argues that Plaintiff's
safety concern was merely a personal preference and an
unwillingness on Plaintiff's part to risk injury to himself which
does not qualify under for protection under CEPA, the record
reflects that is not the case.  Here, Plaintiff's repeated
assertions that he had "safety" concerns regarding the product
load in his truck and that he refused to work in an unsafe manner
clearly reflect more than a personal disagreement with his
employer.  Plaintiff has come forward with evidence, which when
believed, demonstrates that Plaintiff's assertions were tied to

17

his understanding that a federal law or regulation, although he could not specify exactly which one(s), was being violated when Penske attempted to require Plaintiff to take a load which he deemed unsafe.

Specifically, Plaintiff represents that during the course of the September 25, 2010 incident, while on the phone with Donnelly, Plaintiff "tried to bring up to ... Donnelly the [Compliance-Safety-Accountability] training ... and stated that this initiative and the federal regulations the initiative is based on allowed a driver to refuse work he believed was unsafe." (Pl.'s Counterstatement of Material Facts [Doc. No. 10-2] ¶ 21.) Plaintiff also points to the Compliance-Safety-Accountability handout attached as Exhibit C [Doc. No. 10-4] to Plaintiff's Counterstatement of Material Facts, which demonstrates that the "CSA 2010 [was] an initiative to improve the efficiency and effectiveness of the [Federal Motor Carrier Safety Administration's] enforcement and compliance program[.]"  This handout also demonstrates that improper loading of cargo and improper cargo securement are considered as one of seven Behavior Analysis and Safety Improvement Categories used to calculate safety performance under the CSA.  (CSA Handout, Ex. C to Pl.'s Counterstatement of Material Facts [Doc. No. 10-4] 1.)

In response, Defendant admits that "at some point Plaintiff brought up the Compliance Safety Accountability training and that

Mr. Donnelly told [Plaintiff] the training was irrelevant because
it had nothing to do with the volume of product in" Penske's
trucks.  (Def.'s Reply to Pl.'s Counterstatement of Material
Facts [Doc. No. 12-1] ¶ 21) (citing Dep. Tr. of Paul Donnelly,
Ex. 32 to Decl. of Rachel E. Licausi [Doc. No. 12-3] 88:9-13).
When questioned regarding whether Plaintiff was, on September 25,
2010, referencing the safety training he had a few weeks earlier,
Donnelly testified that Plaintiff "was referencing that he could
decline taking a load because he thought it was unsafe and I said
it wasn't relevant, that [type of] safety [issue], to this
[type], and it was not."  (Dep. Tr. of Paul Donnelly, Ex. 32 to
Decl. of Rachel E. Licausi [Doc. No. 12-3] 90:1-6.)  Donnelly
further testified that Plaintiff "referenced the training as
being unsafe and he could refuse" but that "[t]here is nothing
that was ever mentioned in that training about being able to
refuse to take out other than a piece of power equipment."  (Id.
at 91:4-8.)  In Donnelly's view, Plaintiff must not have "pa[id]
attention toward the training" because "it had nothing to do with
out product in our trailers."  (Id. at 91:14-16.)

     Additionally, Plaintiff's September 27, 2010 email statement
to Human Resources, made just two days after the alleged
incident, expressly states that Plaintiff "refused to work [in
an] unsafe" manner because "about 3 weeks ago, we signed
paperwork on the new federal regulations ... one [of] which said

19

that the driver has the power to refuse any work or equipment that they deem unsafe." (Pl.'s Sept. 27, 2010 Email Statement to Penske, Ex. 14 to Decl. of Rachel E. Licausi [Doc. No. 7-7] 3.) Subsequently, in his complaint and his brief in opposition to Defendant's motion for summary judgment, Plaintiff has identified various Federal Motor Carrier Safety Regulations, regulations and standards issued by the Department of Labor under the Occupational Safety and Health Act, and a public policy in the state of New Jersey favoring workplace safety as set forth in the New Jersey Worker Safety and Health Act. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. [Doc. No. 11] (hereinafter, "Pl.'s Opp'n"), 6-19.)

Plaintiff sets forth in great detail, how a substantial nexus exists between these regulations, laws, and mandates of public policy (including the proper loading and strapping of cargo, the avoidance of workplace conditions which pose an unacceptable risk of personal injury to workers unloading and loading commercial delivery trucks, and preventing workplace conduct which can endanger New Jersey employees with risks of physical harm under New Jersey law) — and the conduct complained of in this action (i.e., Plaintiff's refusal to work in an allegedly unsafe manner). Defendant's reply to Plaintiff's opposition fails to challenge, in any meaningful or persuasive way, the substantial nexus which Plaintiff contends exists

20

between his unwillingness to delivery the product load in question because of safety concerns regarding falling or shifting cargo and personal injury from improper working conditions in loading and unloading the vehicle, and the various regulations and law Plaintiff has identified to the Court.

Drawing all reasonable inferences in favor of Plaintiff and believing the evidence offered in opposition to the present motion for summary judgment, the Court agrees with Plaintiff that a substantial nexus exists in this case between the complained-of conduct and the laws, regulations, and public policy identified by Plaintiff. Accordingly, the remaining issues of whether Plaintiff actually held a belief that a violation of law had occurred and, if so, whether that belief was objectively reasonable are left for the jury to resolve. While Defendant clearly argues that any such belief by Plaintiff was not objectively reasonable, this is an issue of fact specifically reserved for the jury to determine and the Court would "overstep[] its bounds by deciding for itself whether [Plaintiff's] complaints were 'trivial' [as Defendant asserts] or 'reasonable.'" Caver, 420 F.3d at 255.

To the extent Defendant takes issue with Plaintiff's purported failure to specifically cite, at the time of the September 25, 2010 incident and subsequently, a specific law or policy allegedly violated by Defendant's conduct, the Court finds

21

that failure of no moment.  (Def.'s Mem. 15.)  First, the Court
notes that during the September 25, 2010 incident and in his
statement to Human Resources, Plaintiff expressly referenced
federal regulations regarding the CSA training program, an
initiative designed and implemented by the Federal Motor Carrier
Safety Administration, which included information on proper
loading and securing of cargo.  Moreover, New Jersey courts
clearly recognize that while "the objecting employee must have an
objectively reasonable belief, at the time of objection or
refusal to participate in the employer's offensive activity, that
such activity is either illegal, fraudulent or harmful to the
public health, safety or welfare, and that there is a substantial
likelihood that the questioned activity is incompatible with a
constitutional, statutory or regulatory provision, code of
ethics, or other recognized source of public policy[,]" CEPA does
not require the objecting employee to have "[s]pecific knowledge
of the precise source of public policy" allegedly being violated.
Mehlman v. Mobil Oil Corp., 707 A.2d 1000, 1015 (N.J. 1998).
"The object of CEPA is not to make lawyers out of conscientious
employees but rather to prevent retaliation against those
employees who object to employer conduct that they reasonably
believe to be unlawful or indisputably dangerous to the public
health, safety or welfare." Id. at 1016.

    In this case, the Court is satisfied that with respect to

22

the first prong of the analysis for CEPA, Plaintiff has demonstrated a substantial nexus between the complained of conduct and the law, regulation, or public policy allegedly violated and thus it is for the jury, and not the Court, to decide whether Plaintiff actually held such a belief and whether that belief was objectively reasonable.

In addressing the remaining contested elements of Plaintiff's CEPA cause of action, the Court finds that Defendant has not met is burden to establish the absence of a genuine issue of material fact because Defendant essentially relies on the same arguments regarding Plaintiff's inability to demonstrate that he held a reasonable belief that Defendant's conduct violated a law, rule, regulation or mandate of public policy in order to show that Plaintiff did not engage in whistle-blowing activity as outlined under CEPA.  However, for similar reasons to those set forth on the first element of Plaintiff's claim, the Court rejects these arguments.

Moreover, Defendant also argues that Plaintiff cannot establish the requisite causal connection between any whistle-blowing activity and his dismissal.  This argument fails because it presupposes that Plaintiff did not engage in any protected conduct, and Defendant asserts that Plaintiff was terminated for his refusal to dispatch based on his unwillingness to risk personal injury.  Defendant further argues that "[n]owhere in the

record is there any indication that anyone at Penske perceived him to be making a claim of a legal violation[.]" (Def.'s Mem. 23.)  However, this argument is belied by the evidence submitted by Plaintiff demonstrating that he specifically referenced his CSA training – an initiative of the Federal Motor Carrier Safety Administration – in his initial conversation with Donnelly just prior to his suspension on September 25, 2010, and again in his September 27, 2010 statement to Human Resources.[6]

## V.   **CONCLUSION**

For the foregoing reasons, Defendant Penske Logistics LLC's motion for summary judgment [Doc. No. 7] is denied.  An Order consistent with this Opinion will be entered.


Date: September 28, 2012          /s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.

---

5.  Defendant's argument that summary judgment is also warranted because Plaintiff cannot establish that Penske's explanation for his termination was false and pretextual is similarly unavailing. Defendant contends that its "legitimate, non-discriminatory reason for [Plaintiff's] discharge [was] his violation of a basic standard of conduct at Penske" for refusal to dispatch.  (Def.'s Mem. 26.)  Defendant asserts that this proffered reason is sufficient to shift the burden to Plaintiff to demonstrate that Penske's reason for his termination was a pretextual cover-up for unlawful retaliation.  However, this argument presupposes that Plaintiff had no objectively reasonable belief that a violation of law, rules, regulation or public policy occurred by Penske based on a safety issue, such that Plaintiff could not refuse the work that day based solely on his personal belief that he would be injured — thereby justifying Plaintiff's termination for refusal to dispatch.

24